## WISE MFG. CO. v. OLIN et al.
### No. 7604.

Circuit Court of Appeals, Ninth Circuit.
July 9, 1935.

Rehearing Denied Sept. 6, 1935.

Clark, Nichols & Eltse, of Berkeley, Cal., for appellant.

Resleure, Vivell & Pinckney, Floyd B. Cerini, and Eugene R. Elerding, all of San Francisco, Cal., for appellees.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

WILBUR, Circuit Judge.

An involuntary petition in bankruptcy was filed March 30, 1933, by E. W. Olin, Ralph Sites, and the Berkeley Pattern Works, creditors having claims for $239.34, $1,029.96, and $183.50, respectively, against the Wise Manufacturing Company. In the original petition the acts of bankruptcy alleged were a preference in favor of some of its creditors in the expenditure of a fund of $605 derived from the sale of the tools belonging to the Wise Manufacturing Company at a time unknown to petitioners, and that the corporation had abandoned its business.

An amended petition was filed June 7, 1933, in which two alleged concealments of assets were relied upon by the petitioning creditors; one was the concealment of the sum of $605 derived from the sale of the tools of the company, which sum, it was alleged in the original petition, had been used for the payment of the debts of the corporation. The other act of concealment was of $75,000 to be paid to the Wise Manufacturing Company by Will H. Hays, Ambrose N. Diehl, and Roy T. Wise, as the consideration for the transfer of certain patents for the Wise Multi-Speed Transmission, as provided in a contract of February 27, 1930, which contract, it is alleged, was concealed from the creditors of the corporation.

The petitioners alleged that they discovered the existence of the contract on the day the original petition was filed (March 30, 1933), and that the patents were transferred in accordance with the contract of February 27, 1930, but that no consideration was paid therefor.

The trial court found that the Wise Manufacturing Company, which we will hereinafter designate as "the appellant," owned the contract of February 27, 1930, and two supplementary contracts between the same parties dated May 8, 1930, and September 1, 1930; that these contracts and the rights flowing therefrom were concealed within the four-month period; and that the sum of $605 was also so concealed, and adjudicated the appellant a bankrupt.

The appellant was not a party to these contracts. They were between Roy T. Wise, party of the first part, and A. N. Diehl and Will H. Hays, parties of the second part. As we will point out, these contracts provided for the payment to the appellant of certain sums and for the disposition of patents which were owned by the appellant. It is a confusion of legal terms to say that the appellant owned these contracts. The rule of law applicable to such a situation is well stated in section 1559 of the California Civil Code: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

The appellees have contended throughout the case that the appellant concealed its property rights in said contracts and the rights thereby vested in the appellant. This involves a confusion of thought, for the real contention of the appellees is that the appellant never knew of the contracts or of the rights flowing to it therefrom. It is obvious in such a case that the concealment was not by the appellant but from the appellant.

With these preliminary observations, we will proceed with a further statement of the facts with reference to the alleged concealment by the corporation within four months prior to bankruptcy.

Roy T. Wise had made certain inventions which may be referred to as the Wise Multi-Speed Transmission and improvements thereon. Some patents had been issued, and others were pending before the Commissioner of Patents. Wise had organized two California corporations, the Standard Die & Tool Company, and the appellant corporation, the Wise Manufacturing Company. The patents had been transferred by Wise to the Standard Die & Tool Company for a large portion of its stock. When the appellant was organized, it was agreed that the patents should be transferred to that corporation by the Standard Die & Tool Company in consideration of the issuance of nearly all its stock. Wise owned much more than a majority of the stock of the Standard Die & Tool Company which owned nearly all the stock of the Wise Manufacturing Company. By reason of this stock ownership, Wise dominated both corporations. He was the president of both, and controlled the board of directors. These corporations were in financial distress and Wise undertook to secure money for them. In this effort he came in contact with the other parties to the contracts executed by him as party of the first part and by Hays and Diehl as parties of the second part. These contracts are complicated and involved and we will not undertake to fully state the terms and conditions thereof. It was agreed in these contracts that Wise was to purchase all the outstanding stock, common and preferred, of the appellant, and also of the Standard Die & Tool Company; that he was to cause the patents to be transferred to a new corporation to be formed by the parties to the contract to be known as the Wise Patent & Development Company, hereinafter called the "development company"; that this new company thus formed was to exploit the patents and distribute the proceeds derived therefrom according to the contract. It was agreed that all indebtedness of the appellant and the Standard Die & Tool Company should be paid by Wise. To this end Wise was to use moneys to be furnished by Hays and Diehl for the purchase of said stock, and for the payment of said obligations.

The first contract provided for the payment to appellant from the fund derived from the exploitation of the patents, the sum of $75,000, "to be by way of reimbursement to the party of the first part [Wise] and the California companies above mentioned, which he controls, for expenditures to date in connection with the development of the patents, together with substantial addition." The agreement provided for the assignment of the patents to the new corporation, and provided as follows: "The consideration for such assignments of all of such patents, applications and rights by the party of the first part, the Wise Manufacturing Company or otherwise, shall be seventy-five thousand dollars ($75,000.00) referred to in Article 7 above and the issuance of all or any part of the stock as the parties of the second part [Hays and Diehl] may elect to the party of the first part [Wise] or to the Wise Manufacturing Company." It was provided that Wise could use funds from the sum of $75,000 referred to in acquiring 100 per cent. stock ownership in the Standard Die & Tool Company and the appellant corporation. The stock ownership in the new corporation acquired by Hays and Diehl under the terms of the agreement was to be in consideration of their assistance in the promotion of said patents and the activities incident thereto in the advancement of certain money for that purpose and for the purpose of the organization of the new

company. The supplementary agreement between the same parties of May 8, 1930, provided for different corporate structure of the proposed corporation to be organized under the laws of the state of Delaware and for the issuance and sale of preferred stock of the par value of $100,000 to be sold at $95 per share ($95,000 in all), and for the loaning of part or all of said fund to Wise. Wise agreed to use the money loaned him in the "retirement of obligations and the purchase of stock owned by others in said California corporations and furnish the parties of the second part [Hays and Diehl] evidence of such application of funds." It was further agreed that this item of $75,000 was entirely independent of the $75,000 mentioned in the first contract. The next contract between the same parties, of September 1, 1930, made certain radical changes in the contracts. This agreement states that a contract had been entered into between the Westinghouse Electric & Manufacturing Company of Pittsburgh, Pa., a Pennsylvania corporation, which will hereinafter be referred to as "the Westinghouse Company," and the Wise Patent & Development Company, dated August 30, 1930; that under the provisions of this contract the Westinghouse Company had paid to the development company $10,000 for an option to acquire an exclusive license under said patents upon the payment of an additional sum not to exceed $25,000. It was agreed that Wise should be paid the $10,000, and also the $25,000, if and when received, but that this money was to be applied upon loans made to him by Hays and Diehl, or by the development company, or by Alonzo C. Owens, but these credits were not to be given to Wise until such times as payment would have been due him under the original contract of February 27, 1930, nor until a $40,000 note given to the Westinghouse Company by the development company on August 30, 1930, indorsed by Wise, Hays, and Diehl, had been paid. It was further agreed that the development company could use its earnings in repayment of loans extended by the development company, or in the retirement of the preferred stock of the development company and in payment of dividends thereon. It was further agreed that Hays and Diehl should not be obligated to advance further funds or to cause the development company to advance funds to enable Wise to acquire stock owned by others than himself and his wife in the California corporations. It was pro-

vided also that Hays and Diehl might in their discretion exercise the options outstanding for the purchase of said stock.

Wise purchased all the outstanding stock of the appellant except that owned by the Standard Die & Tool Company, and all the common stock of the Standard Die & Tool Company; of the 258 shares of the preferred stock of the Standard Die & Tool Company owned by others than Wise he purchased much of such stock. All the obligations of the appellant and the Standard Die & Tool Company existing at the time of the contract of February 27, 1930, were paid. The appellees became creditors after the contract of February 27, 1930.

The appellant corporation had no connection with these contracts. They were contracts of Roy T. Wise.

On May 5, 1930, in pursuance of a resolution duly entered upon the minutes of the Standard Die & Tool Company, that corporation authorized the transfer of all patents in question to the development company. The legal title to these patents was still in the Die & Tool Company although the equitable ownership was in the appellant. The directors of the appellant approved the transfer of these patents. On December 26, 1930, the Standard Die & Tool Company, claiming to own all the stock of the appellant, confirmed the transfer of its patents to the development company. The trial court found that Wise acquired all the outstanding stock of appellant about May, 1930, and ever since the corporation has been his alter ego. This finding must be read in the light of the fact that the Standard Die & Tool Company owned 4,670 shares of the stock of the Wise Manufacturing Company and that the outstanding stock referred to in the finding is the 271 shares which were owned by others. The Standard Die & Tool Company still has outstanding some of its preferred stock. Consequently, it cannot be said that either corporation was the alter ego of Wise or that the contracts of Wise were the contracts of these corporations.

It will be observed that all these transactions were fully consummated nearly three years before the filing of the involuntary petition in bankruptcy. The only theory upon which it is claimed the bankruptcy court has jurisdiction is because of the alleged continued concealment of the three contracts and of the benefits accruing to the appellant therefrom. As we have

already pointed out, the contracts did not belong to the corporation and were not concealed by it. It had a right if and when it discovered such contracts to elect to receive the benefits, if any, flowing to it therefrom, if so advised. Until it exercises such option, its rights and the rights of the creditors and the stockholders arose by reason of the transfer of its patents in 1930 without consideration. We are not here concerned with the exact nature of the rights of the corporation or its stockholders or creditors arising from the transfer of its patents. The appellees did not attempt to define these rights and do not rely upon them, but rely entirely upon the theory that the corporation acquired rights under these contracts and concealed such rights from the creditors. It had no such rights and there was no such concealment.

As we are only concerned with the question of the jurisdiction of the bankruptcy court alleged to have arisen from the discovery of the alleged concealment by the appellees during the four-month period prior to the filing of petition in bankruptcy, it is unnecessary to pursue the subject further.

 The other item alleged to have been concealed is the sum of $605 received by the appellant in 1930 as the proceeds of the sale of its tools made at or about the time it suspended the manufacturing business. This money was deposited by the company's stenographer, H. Jacobson, in her personal bank account. It is conceded by the appellant that this deposit was so made for the purpose of avoiding attachments by creditors, but it is also claimed that it was for the purpose of distributing this asset ratably among the creditors. After the deposit was thus made, some of these moneys were paid out to appellant's creditors and upon demand for return of the balance of this fund to the appellant's treasury, the stenographer deducted the sum of $350 due her and forwarded the balance to the attorneys of the corporation who applied it to the fees due them from the corporation, all long before the beginning of the four months prior to bankruptcy. The appellant claims that if it be assumed, as it must be, that the secret deposit of appellant's funds in the name of the stenographer to prevent attachment was a concealment of such funds, it occurred long before the beginning of the four-month period prior to bankruptcy. The appellees contend that the concealment was continuous from the date of the deposit in 1930 until the discovery of such concealment by appellees during the four-month period. The question is whether or not there was a continuous concealment extending into the four-month period prior to bankruptcy.

It is clear that as result of this transaction the appellant corporation made preferential payments to its creditors as it was entitled to do under the law. After these payments had been made there could be no further concealment of the property thus expended as it no longer belonged to the corporation. One of the purposes of confining acts of bankruptcy to the four-month period is in order to facilitate the recovery by the trustee in bankruptcy of the property which has been concealed or fraudulently transferred for any purposes. In legal effect the adjudication in bankruptcy relates back to the beginning of the four-month period. It is clear that this money which had been paid out by the corporation upon its indebtedness cannot be recovered now by the trustee in bankruptcy as a preferential payment. The concealment terminated by the payment of the fund to creditors.

Order reversed.